**IN THE UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF FLORIDA**

**ORLANDO DIVISION**

| | |
|---|---|
| COLBY ALEXANDER FRANK, an individual,<br><br>        Plaintiff,<br><br>  v.<br><br>RANDALL ADAM FINE (a/k/a RANDY FINE) in his official capacity as Member of the Florida House of Representatives for the 33rd Congressional District of the State of Florida; and in his individual capacity; and DOES 1-99;<br><br>        Defendants. | Case No.: 6:23-cv-2043-PGB-RMN<br><br>**PLAINTIFF'S THIRD AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>  (1) DEFAMATION<br>  (2) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS<br>  (3) FALSE IMPRISONMENT<br>  (4) INVASION OF PRIVACY<br>  (5) DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. § 1983<br>  (6) CONSPIRACY, 18 U.S.C. § 241 |

Plaintiff Frank, proceeding on his own behalf as a *pro se* litigant, hereby complains and alleges as follows:

**INTRODUCTION**

1.      Freedom of expression is among the most cherished rights guaranteed by our nation's founding document. U.S. CONST. amend. I; *Near v. Minnesota*, 283 U.S. 697 (1931).

2.      Censorship, on the other hand, is the antithesis of free speech. It is antithetical not only to the freedom of speech guaranteed by the First Amendment, but also to a free society generally. "Censorship reflects a society's lack of confidence in itself. It is a hallmark of an authoritarian regime." *Ginzberg v. United States*, 383 U.S. 463 (1966) (Potter, J., Dissenting).

3.      For centuries, the U.S. Supreme Court has held steadfastly to the principle that the remedy to unwanted or disagreeable speech is not censorship, but rather, more speech. *See, e.g.,*

*Whitney v. California*, 274 U.S. 357 (1927) (Brandeis, J., Concurring) ("If there be time to expose through discussion [] falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence.").

4.      This Complaint sets forth a powerful instance of a State Government official's efforts to silence speech which he finds disagreeable. As set forth below, Defendant Fine, a State Government official, has employed means of defamation, promoting and co-introducing legislation, engaging in libelous intimidation on social media, and other unlawful acts as set forth in this Complaint. Defendant's actions, taken with the purpose of intimidating Plaintiff into silence, have the stated purpose of chilling the expression of Plaintiff's First Amendment rights.

5.      In bringing this action, Plaintiff seeks to vindicate his Constitutionally protected right to the freedom to speak, publish, and otherwise engage in public debate through lawful and peaceable means. By filing this Complaint, Plaintiff Frank seeks to hold accountable public officials who have engaged in a targeted effort to deprive him of that right by unlawfully seeking to intimidate, defame, and legislate him into silence.

6.      In this Third Amended Complaint, Plaintiff sets forth additional facts supporting his claims and asks that the Court consider all new facts and circumstances herein alleged in evaluating whether this Complaint has asserted a claim for relief sufficient to overcome dismissal under 28 U.S.C. 1915(e)(2)(B)(ii). As a Claimant is proceeding *in forma pauperis*, Plaintiff also requests that the Court adopt the most liberal construction of this Complaint, in addition to taking all stated facts as true consistent with generally recognized federal pleading standards.

**PARTIES**

7.      Plaintiff COLBY FRANK is a natural-born citizen of the State of Florida residing in the Middle District of Florida.

2

8.      Defendant RANDALL ("RANDY") ADAM FINE is a Member of the Florida House of Representatives for the 33rd Congressional District. On information and belief, Defendant FINE is domiciled in the district.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this case arises under the Constitution and laws of the United States.  While joining his common law claims for tort damages under Florida state law, Plaintiff seeks to remedy the wrongful deprivation of his constitutional rights through a federal right of action afforded by 42 U.S.C. § 1983.

10.      This Court also has jurisdiction pursuant to the specific grant of 28 U.S.C. § 1343 because Plaintiff seeks to recover damages for the deprivation of his Constitutional rights. *See* 42 U.S.C. § 1983. The exercise of this Court's jurisdiction is consistent with Article III, Section 2 of the U.S. Constitution. *See* U.S. CONST. Art. III, Sec. 2, cl. 1.

11.      This Court has jurisdiction to consider Plaintiff's state law claims properly joined under Fed. R. Civ. P. Rule 8 pursuant to 28 U.S.C. § 1367. The common law torts alleged were committed in furtherance of and conjunction with Defendants' violations of federal law, and the federal issues predominate over any state law issues that may be raised, which do not raise novel nor complex issues of state law.

12.      Venue is proper in the Middle District of Florida because a substantial part of the events and transactions giving rise to Plaintiff's claims occurred within the forum state and within the Middle District of Florida. *See* 28 U.S.C. §§ 1441, 1443.

## STATEMENT OF FACTS

13.     Since approximately 2020, Plaintiff has been engaged in a widely publicized campaign of literature distribution in association with a parodically-titled group known as the "Goyim Defense League" ("GDL").[1] The GDL, which stylizes its name and logo in the fashion of the Anti-Defamation League ("ADL"), engages in various Constitutionally protected flyer distribution and banner-display activities in the District and across the United States. Through their various First Amendment activities, Plaintiff and the GDL seek to bring public awareness to their sincerely held beliefs on topics spanning American history, politics, religion, and government.

14.     Due to the controversial nature of their speech, Plaintiff and the "GDL" have garnered media coverage of their public activities in nearly all 50 States.  This is because Plaintiff's speech often arouses the most personal and intimate sensibilities of his fellow citizens—especially those sympathetic to the American Jewish population, who perceive plaintiff to be "antisemitic." *See, e.g.*, Anti-Defamation League. "Backgrounder: Goyim Defense League." (July 5, 2023) ("GDL espouses vitriolic antisemitism and white supremacist themes.") (accessed January 13, 2024).

15.     The Anti-Defamation League is at the forefront of monitoring what it perceives to be antisemitic activity. Plaintiff, on the other hand, believes that his speech amounts to a fair and honest critique of Jewish participation and influence in American public life. Nonetheless, is

---

[1] "Goyim" (also "goy", singular), is an antiquated Yiddish term used in rabbinical literature to refer to non-ethnically Jewish people. *See* ROSEN-ZVI, ISHAY, and ADI OPHIR. "Paul and the Invention of the Gentiles." *The Jewish Quarterly Review* 105, no. 1 (2015): 1–41 *available at* < http://www.jstor.org/stable/43298709>. *See also* PERSICO, TOMER. "How the Jews Invented the Goy: Two Israeli scholars examine the dramatic and surprising history of one of the oldest Jewish institutions: the sharp separation between 'them' and 'us'." *Haaretz* (Nov. 9, 2019) *available at* < https://www.haaretz.com/israel-news/2019-11-09/ty-article-magazine/.premium/how-the-jews-invented-the-goy/0000017f-dc77-d3a5-af7f-feff061b0000>.

unsurprising that pro-Jewish interest groups such as the ADL have taken an acute interest in publishing about GDL and Plaintiff's speech. By way of example, Plaintiff and his colleagues have previously engaged in the public distribution of flyers entitled "Why are Jews allowed to suck baby penis?" The flyers exhibit several images of Orthodox Jewish rabbis performing a religious ritual known as Metzitzah B'peh, which translates in English to "oral suction." The images on the flyers display Jewish rabbis engaged in the ritual which involves a Rabbi (mohelim) using his mouth to suction blood from a newborn infant's circumcised penis.[2]

16.     Plaintiff also frequently distributes—and plans to continue to distribute—flyers containing no vulgar language or images whatsoever, which contain his personal religious and political views.

17.     The sensational content exhibited in Plaintiff's speech does not contain any fighting words or any calls to action, but purports to include statements of fact, often citing mainstream news headlines, and sometimes citing Jewish sources as well. The distribution of flyers such as those described above are reflections of Plaintiff's sincerely held beliefs respecting the proper relationship between religion and child health and safety.

18.     As a member of the Jewish community, Defendant Fine has sought to erect protections for the Jewish community by seeking to root out critique of the Jewish community. Defendant Fine's actions as an enforcer for the Jewish community appear to be consistent with that community's values and written beliefs. *See, e.g., Sanhedrin* 59a ("A goy who pries into The Law [Talmud] is guilty of death."); *Libre David* 37 ("To communicate anything to a Goy about

---

[2] *See* Tanne, Janice. "Ultra-Orthodox Jews criticized over circumcision practice. BMJ. (Jan. 2006) 21;332(7534):137 (discussing meeting between New York City Department of Health and Mental Hygiene and representatives of New York's Jewish community to resolve a controversy over the death of a newborn boy from herpes simplex type 1, and brain damage and infection suffered by two other infants). *Available at* <https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1336756/>

our religious relations would be equal to the killing of all Jews, for if the Goyim knew what we teach about them, they would kill us openly.")

19.     Due to the nature of Plaintiff's speech, he has been unable to obtain legal services from any attorney in the State of Florida, undoubtedly out of legal professionals' fear for public ridicule and "guilt by association." Ironically, it is not because of any disagreement with the content of Plaintiff's speech itself that has discouraged counsel from proceeding with representing Plaintiff, but rather fear for the public and media backlash against Plaintiff and his counsel. Plaintiff is therefore compelled to proceed with this action as a *pro se* litigant to vindicate his Constitutional rights and seek damages against Defendant for his unlawful conduct. This is due in no small part to Defendant Fine's efforts to defame and intimidate Plaintiff.

I.     **Defendant Fine Retaliates Against Plaintiff's Constitutionally Protected Speech by co-sponsoring Legislation with the Intent and Effect of Chilling Plaintiff's Protected Speech.**

20.     Since 2020, Plaintiff has engaged in the random distribution of flyers such as those described in Paragraph 15 throughout the District. Plaintiff has done so lawfully and without malicious intent. Indeed, every flyer Plaintiff has ever distributed includes the printed words "these flyers were distributed randomly without malicious intent."

21.     Plaintiff engages in political and religious commentary by sharing flyers with members of his community. Each flyer Plaintiff has distributed contains a URL where the reader can navigate to a website to view the same or similar flyers. *See* <GTVflyers.com>.

22.     Defendant Fine became aware of Plaintiff and/or GDL's flyers. Because he disagreed with the content in the flyers, he set out immediately to shut it down. Defendant Fine posted a Tweet indicating his intent to advocate legislation that would prohibit any such

distribution of literature: "Once HB 269 is signed by Governor DeSantis, [the website owner]

will get five years in prison to consider the downside of trespassing and littering hate speech."



My 11 year-old son found this on our driveway in a bag with rocks this morning. (I've edited out the group that sent to not give them pub). The website is owned by Adam Donaldson of Jacksonville. Feel free to call him to let him know what you think of his flyer at 8594215855.

He won't be able to do this much longer. Once HB 269 is signed by Governor DeSantis, he will get five years in prison to consider the downside of trespassing and littering hate speech.
#NazisGoingToJail

23.    Defendant Fine has referred to individuals who distribute these flyers, as well as

Plaintiff specifically, as "Nazi." Defendant Fine used this rhetoric to justify his plan to pass

Florida House Bill 269. On February 27, 2023 Defendant Fine stated that "HB 269 [] will put

them where they belong – in prison."



Nazis are not welcome in Florida.  Period.

I was honored to join Volusia County Sheriff Chitwood yesterday for an extraordinary press conference calling these people what they are — scumbags — and committing to pass HB 269 which will put them where they belong — in prison.

My remarks begin at minute 10.



youtube.com
VSO News Conference: Rallying Against Hate
2/27/23

7

24.     Plaintiff also participates in displaying banners expressing his political and religious beliefs. In 2021, Plaintiff participated in displaying a political slogan on an Interstate-95 overpass. Defendant Fine, communicating his personal dislike for Plaintiff's speech, called for violence to shut it down. Defendant Fine responded to the I-95 incident by stating "Kyle should shoot these assholes" with accompanying reshared language "This is sickening!!"



25.     Defendant Fine has a long history of calling for threats and violence against his political opposition.  In a press release it was confirmed that Defendant Fine posted to Facebook "Kyle should shoot these assholes," referring to a political banner pointing out that all three BLM rioters shot in self-defense by Kyle Rittenhouse happened to be Jewish.

**II. After the Passage of H.B. 269, Plaintiff is Arrested and Jailed.**

26.     As House Whip in the Florida Legislature, Defendant Fine campaigned throughout 2023 to cause Plaintiff and Plaintiff's friend's trouble with law enforcement as retaliation for First Amendment protected activities.

27.     Defendant Fine has a long history of conspiring with other political agents and agencies as retaliation against First Amendment protected free speech activities as well as abusing his position as a legislative representative to attack the voice of other political positions.

In his own words, Defendant Fine spoke at the February 2023 Volusia County press conference about how proud he was of his efforts to outlaw federally protected First Amendment activities.

28.    Defendant Fine has also made several phone calls to other Law Enforcement Agencies throughout the State as a direct result of other literature distributions that he did not like.



29.    In May 2023, Plaintiff was arrested in connection with a flyer distribution campaign and jailed for several hours.

30.    Prior to Plaintiff's arrest, Defendant Fine coordinated with multiple law enforcement agencies in an attempt to shut down Plaintiff's and the [GDL's] speech.

31.    Defendant Fine's published statements indicate his intent to use House Bill 269, a bill he co-introduced, to jail, imprison, and stifle Plaintiff for engaging in protected free speech activities.

## II.    Plaintiff Attempts to Speak with Defendant Fine; Defendant Fine Retaliates with Defamation; Appropriates Plaintiff's Name and Likeness; Uses Fighting Words.

32.    On the morning of October 4, 2023, Plaintiff sought to speak with Defendant Fine outside of the Bravard Federated Republican Women's monthly meeting, where Defendant Fine

was scheduled to appear as the keynote speaker.  Plaintiff intended to ask Defendant Fine about

his role in the drafting and signage of Florida H.B. 269, as well as the broader involvement of the

Jewish community in supporting various progressive causes.

33.     That morning, in the venue parking lot, Plaintiff approached Defendant Fine with

a GoPro camera in one hand, and a stapled packet of political and religious literature in his other

hand.

34.     As Fine approached the venue, Plaintiff said "Is that Randy Fine?  Mr. Fine?"

35.     Defendant Fine acknowledged Plaintiff's presence, and then asked, "who are

you?"

36.     Plaintiff responded kindly with a smile, "Colby Frank, Goyim Defense League."

Plaintiff then invited Defendant Fine to schedule a debate with him regarding the literature he

was carrying, and to discuss a range of topics spanning politics and religion.

37.     Defendant Fine scoffed at Plaintiff, then responded by calling Plaintiff "scum," "a

fucking Nazi," and other terms.

38.     Defendant Fine exclaimed, "you're lucky I don't punch you in the fucking face."

39.     Before he removed himself from Plaintiff's vicinity, Defendant Fine then further

boasted that "antisemitism" could never be defeated with "assholes like you in our state."

Plaintiff followed up with his invitation for Defendant Fine to debate him. Defendant Fine did

not acknowledge this request, and instead exclaimed "you're beneath me" before storming off.

40.     Defendant Fine, in his speech, then claimed before an audience of Republican

women that *Plaintiff* had assaulted *him* prior to the speaking engagement. Defendant Fine also

stated to the press that Plaintiff had "jumped" him in the parking lot.

41.     At no time during the interaction did Plaintiff exhibit any physical manifestations

[his hands were occupied] of aggression, or otherwise compose himself in anything other than

professional and gentlemanly manner. In fact, at one point of the interaction, Plaintiff asked,

"can we have a gentlemanly conversation?" and reiterated several times "will you debate the

flyers?"

42.     After the event, Defendant Fine made several knowingly false statements of fact

respecting the interaction with the intent of disparaging Plaintiff's reputation and defaming

Plaintiff.

43.     Defendant Fine falsely stated "I just got jumped by a Nazi with a camera walking

into a widely publicized speaking event just now."



44.     Defendant Fine falsely stated to Florida Today, which published an article with

his statement, that Plaintiff had "unleash[ed] a stream of invective about Jews and wanted to

know why I wouldn't debate him, or whatever." In truth and in fact, Plaintiff did not mention the

word "Jew" at any time during the interaction.  To the contrary, Plaintiff represented that he was

willing to "cease and desist" from sharing any more flyers if Defendant Fine would agree to have

a gentlemanly debate with him regarding the content of the flyers. Defendant Fine later repeated

the knowingly false statement both on Twitter and to Florida Today that he had been "jumped"

by Plaintiff.

Florida Today Article (next page):



Brevard Rep. Randy Fine says run-in with anti-Jewish extremist left him 'a little shaken'

Story by Eric Rogers, Florida Today • 4d

State Rep. Randy Fine said he had an "unsettling" encounter Tuesday with a member of an anti-Jewish extremist group outside a speaking engagement in Cocoa, warning it appeared to be an escalation of recent antisemitic incidents in the area.

Fine, who is Jewish, said the man aggressively approached him with a camera outside an unrelated meeting of the Brevard Federated Republican Women on Tuesday at the Space Coast Convention Center in Cocoa, where Fine was booked to speak.

"He runs up to me and he goes, I'm so-and-so — I don't remember his name — with the Goyim Defense League," Fine told FLORIDA TODAY. "He then proceeds to unleash a stream of invective about Jews and wanted to know why I wouldn't debate him, or whatever."

Defendant Fine's Twitter (X):



Rep. Randy Fine reposted
Florida's Voice ✓
@FLVoiceNews

Rep. @VoteRandyFine says he was "jumped" by a member of an antisemitic group on his way to an event

**IV.    Defendant Fine defamed Plaintiff by falsely stating that Plaintiff was being prosecuted for a violent felony.**

12

45.     On October 4, 2023, following the Plaintiff's brief interaction with Defendant

Fine, Defendant Fine made additional defamatory and knowingly false statements about

Plaintiff.

46.     Defendant Fine followed up on his previous statement to confirm he was

concerned about identifying Plaintiff and "I got pictures" (next page):

> **Rep. Randy Fine**      ...
> @VoteRandyFine
>
> Clearly, he couldn't take it one on one, because as I left, four of his
> friends were hooting and hollering on the street corner.   I got pictures,
> though being the cowards they are, most were masked.
>
> > **Rep. Randy Fine** @VoteRandyFine · Oct 4
> > I just got jumped by a Nazi with a camera walking into a widely publicized
> > speaking event just now.  I'm fine; not sure today will go down as one of his
> > better days.

47.     On his twitter tirade Defendant Fine also shared Plaintiff's picture, clearly

showing Plaintiff's face. The photo was posted on Defendant Fine's X and reshared to multiple

news agencies.

> **Rep. Randy Fine**      ...
> @VoteRandyFine
>
> Here's a pic of the Nazi who jumped me.

48.     After associating Plaintiff with "Nazis," Defendant Fine then stated he wants to

legalize punching Nazis.

49.     Defendant Fine published on X (formerly twitter) the knowingly false or reckless

statement of fact that Plaintiff was being prosecuted for a violent felony.  (Docket 23 Page 5)

(Packet B) (also provided here). Mr. Fine's tweet about [Plaintiff] being prosecuted for a violent

felony fulfills the requirement of reckless disregard of whether it was true or false.  It is in fact so

reckless that Mr. Fine tweeted Plaintiff was being prosecuted for a violent felony when the

charging statutory language from my charge (which was dismissed) reads "Obstruct Without

Violence."

**Rep. Randy Fine**
@VoteRandyFine                                                    ...

Here's the Nazi's background!  Already being prosecuted for one violent
felony.  Such losers.  Mom must not have hugged him enough.
canarymission.org/individual/Col…

> **Rep. Randy Fine** @VoteRandyFine · Oct 4
> Here's a pic of the Nazi who jumped me. twitter.com/voterandyfine/…

### CLAIMS FOR RELIEF

**COUNT I: Defamation (Libel) and Defamation Per Se.**

50.      Plaintiff re-alleges and incorporates all other paragraphs in this Complaint as if

fully restated herein.

51.      Defendant Fine made statements about Plaintiff that were knowingly false,

reckless, or some combination thereof. Defendant Fine's statements made with actual malice

including accusing Plaintiff of having been prosecuted for a "violent felony," where the public

record demonstrates that Plaintiff has been arrested for obstructing arrest "without violence" and

for a nonviolent misdemeanor constitutes defamation per se.

52.      Defendant Fine also failed to make any inquiry or proper investigation prior to

publishing per se defamatory statements of false fact which constitutes actual malice and

reckless abandon. *Herbert v. Lando*, 441 US 153 (1979).

53.     There also exists between Plaintiff and Defendant "rivalry, ill will, or hostility between the parties, facts tending to show a reckless disregard of the plaintiff's rights." *Herbert v. Lando*, 441 US 153 (1979).

54.     Wherefore, Plaintiff prays for $1,500,000 in compensatory damages to remedy irreversible harm to Plaintiff's reputation and his ability to seek employment utilizing his advanced degree in aerospace engineering.[3]

**COUNT II: Intentional Infliction of Emotional Distress.**

55.     Plaintiff re-alleges and incorporates all other paragraphs in this Complaint as if fully restated herein.

56.     Defendant Fine engaged in a pattern of conduct including attending press conferences and campaigning to outlaw the foundational methods of engaging in protected speech via pamphlets to spread political and religious messages. Defendant Fine's conduct was reckless and outrageous and demands a fully knowledgeable mental state of what he was doing. He intended his behavior when he knew or should have known that severe mental and emotional distress would likely result. To campaign for jailing political opponents is atrocious and goes beyond all bounds of decency and is utterly intolerable in a civilized society where we claim to uphold freedom of the press. Defendant Fine commonly used Plaintiff's face as if he was a criminal when he was and is not.

57.     Defendant Fine's actions in whole or part have instilled severe levels of paranoia in many of plaintiff's close friends and family, with some believing that Plaintiff's house may be raided in the middle of the night by overzealous officials or agents thereof.  Plaintiff has had a

---

[3] The U.S. Bureau of Labor Statistics provides that the median annual pay for an aerospace engineer in 2022 was $126,880.

severe loss of the enjoyment of life, mental fear and anguish at the hands of Mr. Fine and local

and state government and due to his memory of arrest, severely lost trust in honest and fair

government, and among other things had to deal with the realities of losing friends to the custody

of the state for non-criminal activities.  Plaintiff's prospects in seeking employment in his

advanced area of expertise in aerospace engineering have likewise been severely diminished.

58.     Wherefore Plaintiff prays for $500,000 to remedy the harms caused by Defendant

Fine's reckless and outrageous conduct causing substantial, measurable, and severe emotional

distress to Plaintiff.

## COUNT III: False Imprisonment.

59.     Plaintiff re-alleges and incorporates all other paragraphs in this Complaint as if

fully restated herein.

60.     Where Defendant Fine's conspiring clearly played a role in Plaintiff's

imprisonment, for wrongful arrest and imprisonment Plaintiff prays for $1,500,000 in damages.

## COUNT IV: Invasion of Privacy.

61.     Plaintiff re-alleges and incorporates all other paragraphs in this Complaint as if

fully restated herein.

62.     Defendant Fine wrongfully and unlawfully appropriated Plaintiff's image and

likeness, shared and published photos of Plaintiff in connection with false defamatory statements

that Plaintiff had committed a violent crime, and promoted the dissemination of that image

alongside defamatory information to various media outlets in the District and State.

63.     Defendant Fine utilized and appropriated Plaintiff's name and likeness, in

connection with false statements of fact amounting to defamation per se, in order to promote his

own legislative and political purposes, including fundraising to pursue elected office.

64.     Wherefore Plaintiff prays for $1,000,000 in compensatory damages for the wrongful appropriation of Plaintiff's name and likeness.

**COUNT V: First Amendment Retaliation, 42 U.S.C. § 1983.**

65.     Plaintiff re-alleges and incorporates all other paragraphs in this Complaint as if fully restated herein.

66.     Defendant Fine was the driving force behind the drafting and signage of a new hate crime enhancement to the Florida litter law, going so far as to campaign at press conferences for it, and to co-author the bill.  These actions required a mental state of full knowledge of what he was doing, planning and executing his moves with the intent to punish Plaintiff for his speech activities.  Defendant Fine's conduct was egregious, stating that flyer distributors would spend five years in prison—a statement which was also repeated on live network television.  Defendant Fine has tweeted and posted that Plaintiff's activities and religious speech suggest that he belongs in jail.

67.     Defendant Fine was also a driving force behind the persecution of political and religious literature being classified as litter [to make it a crime that he could legislate a hate crime enhancement for] when it previously never was.  Where the Florida litter law is a part of the chapter of the Florida Statutes on environmental and pollution control, it is unconstitutional as applied to First Amendment publishing and circulation activities.  This did not stop Defendant Fine from campaigning to have Plaintiff's literature classified as "litter."

68.     The Supreme Court's precedents set forth clear exceptions from various nuisance ordinances for political and religious literature distributions.  *See Schneider v. State*, 308 U.S. 147, (1939); *Jamison v. Texas*, 318 U.S. 413 (1943); *Watchtower Bible & Tract Society of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150 (2002), to name a few.

69.     Defendant Fine conspired with nonprofit associations including the Anti-Defamation League, as well as the Florida Legislature and the Volusia and Palm Beach County Sheriff's departments to retaliate against Plaintiff and prohibit him from engaging in constitutionally protected speech activities, resulting in Plaintiff's arrest, jailing, and being subject to public ridicule, all of which rise well above the level of *de minimis* harm to Plaintiff's First Amendment rights; Whereby plaintiff and his friends were and are being jailed and dragged through the local criminal courts under color of law for engaging in constitutionally protected political and religious speech.

70.     Plaintiff's arrest was in retaliation for Plaintiff's engaging in protected speech including distribution of flyers expressing his sincerely held religious and political beliefs, and honest criticism of his state and local government. Defendant Fine's retaliatory animus was the direct and proximate cause of Plaintiff's arrest arising from his constitutionally protected activities. Other citizens of the State of Florida and in the District who were similarly situated, i.e, distributing literature containing their personal political and religious views, should they not be critical of Jewish influence, were not subject to the same targeted campaign by Defendant Fine to deny their rights to share their beliefs and engage in public debate by means of distributing flyers or displaying political and religious slogans near public roadways.

71.     For the unconstitutional retaliation against Plaintiff's First Amendment rights, and the denial of his ability to exercise those Constitutional rights, Plaintiff prays for $5,000,000 in damages.

## **PRAYER FOR RELIEF**

72.     Defendant Randy Fine caused substantial and irreversible harm to Plaintiff and his reputation. Defendant Fine's defamatory statements, intentional infliction of emotional

distress, and false imprisonment of Plaintiff were committed in furtherance of a conspiracy to substantially deprive Plaintiff of his Constitutional rights; Plaintiff therefore asks for judgment to be entered in the total amount of $9,500,000.

73.     Plaintiff also asks for punitive damages because Plaintiff and many others sustained and will continue to sustain injuries as a result of unlawful, unfair, and unconstitutional activities by Defendant Fine that were knowing, intentional, reckless, or some combination thereof.

74.     Plaintiff further requests that this Court enter a writ of *quo warranto* as to Defendant Fine.

75.     Finally, Plaintiff prays for emergency preliminary injunctive relief as to the unconstitutional enforcement of H.B. 269, as well as a writ of injunction against all law enforcement agencies attempting to persecute, arrest, or otherwise harass plaintiff for engaging in constitutionally protected literature distributions, including specifically the Palm Beach County Sheriff's Office and the Volusia County Sheriff's Office, where Plaintiff plans to again attend the 2024 Daytona500 to distribute his leaflets outside the superspeedway.

76.     The irreparable harm to Plaintiff caused by Defendant Fine's conspiring and the new H.B.269 places a substantial obstacle in the way Plaintiff's exercise of First Amendment rights and is sufficiently great to override the risk of error in granting an injunction to prohibit the unlawful enforcement of H.B. 269 as well as other nuisance ordinances in a manner that impairs and chills his protected speech.

77.     As a result of Defendant Fine's conspiring against Plaintiff, Plaintiff has been arrested, jailed, and deterred from exercising his right to speak and distribute literature for fear of arrest and imprisonment. Defendant Fine's statements substantiate that the stated legislative

purpose of H.B. 269 was in fact to chill Plaintiff's speech and imprison Plaintiff for violation of

the State law. Plaintiff was, is truth and in fact, arrested and jailed after exercising his First

Amendment rights to distribute literature containing his personal religious and political beliefs.

Respectfully submitted this 16th day of January 2024.

/s/ Colby Alexander Frank

Colby Alexander Frank, Man

***Pro Se / In Forma Pauperis***

PO Box 13264
Fort Pierce, FL 34979
941-275-5712