## IN THE UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF FLORIDA

## ORLANDO DIVISION

| | |
|---|---|
| COLBY ALEXANDER FRANK,<br><br>   Plaintiff,<br><br>v.<br><br>RANDALL ADAM FINE (a/k/a RANDY FINE) in his official capacity as Member of the Florida House of Representatives for the 33rd Congressional District of the State of Florida; and in his individual capacity,<br><br>   Defendant. | Case No.: 6:23-cv-2043-JSS-RMN<br><br>**PLAINTIFF'S THIRD AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br> (1) DEPRIVATION OF CIVIL RIGHTS / FIRST AMENDMENT RETALIATION, 42 U.S.C. § 1983<br> (2) DEFAMATION<br> (3) INVASION OF PRIVACY |

Plaintiff Colby Alexander Frank seeks this court's leave to proceed *in forma pauperis* and hereby files this Third Amended Complaint, alleging as follows:

## INTRODUCTION

1. The freedoms to speak and to publish are guaranteed by our Nation's founding document. U.S. CONST. amend. I; *Near v. Minnesota*, 283 U.S. 697 (1931).

2. Censorship is the antithesis of free speech. "Censorship reflects a society's lack of confidence in itself. It is a hallmark of an authoritarian regime." *Ginzberg v. United States*, 383 U.S. 463 (1966) (Potter, J., Dissenting). For centuries,

the U.S. Supreme Court has held steadfastly to the principle that the remedy to unwanted or disagreeable speech is not censorship, but rather, more speech. See, e.g., *Whitney v. California*, 274 U.S. 357 (1927) (Brandeis, J., concurring) ("If there be time to expose through discussion [] falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence.").

3.     It is "settled law that state officials may not retaliate against associations and individuals for their exercise of First Amendment rights." *Georgia Ass'n of Educators v. Gwinnett Cnty. Sch. Dist.*, 856 F.2d 142, 145 (11th Cir. 1988). Even small infractions may provide ample grounds for civil enforcement. "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir 1982) (Posner).

4.     The facts that follow set forth a powerful instance of a State Government official's efforts to silence speech which he finds disagreeable. Representative Randy Fine, a Florida State Legislator, has engaged in a pattern of retaliatory conduct against Plaintiff with the stated intention of deterring Plaintiff from exercising his First Amendment rights to speak and publish freely. Representative Fine has engaged in retaliatory acts both within the scope of his official legislative role, and outside any legitimate legislative function. Those acts include sharing defamatory remarks about Plaintiff on social media, authoring

and co-introducing legislation with a stated intention of targeting Plaintiff's speech, calling and instructing law enforcement agencies to arrest individuals associated with plaintiff's literature, and accusing Plaintiff of being a criminal and terrorist while publishing his name and photograph—when he is not and never has been a criminal or terrorist. These acts, set forth in detail below, were all taken with the express purpose of intimidating Plaintiff into silence, and chilling the expression of his First Amendment rights.

5.      In this Third Amended Complaint, Plaintiff sets forth additional facts supporting his claims and asks that the Court consider all new facts and circumstances herein alleged in evaluating whether this Complaint has asserted a claim for relief sufficient to overcome dismissal under 28 U.S.C. 1915(e)(2)(B)(ii). As a claimant proceeding *pro se* and seeking leave to file *in forma pauperis*, Plaintiff also requests that the Court adopt the most liberal construction of this Complaint, in addition to taking all stated facts as true consistent with generally recognized federal pleading standards.

## PARTIES

6.      Plaintiff COLBY ALEXANDER FRANK is a natural-born citizen of the State of Florida residing in the Middle District of Florida.

7.      Defendant RANDALL ("RANDY") ADAM FINE is a Member of the Florida House of Representatives for the 33rd Congressional District. On information and belief, Defendant FINE is domiciled in the district.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this case arises under the Constitution and laws of the United States. While joining his common law claims for tort damages under Florida state law, Plaintiff seeks to remedy the wrongful deprivation of his constitutional rights through a federal right of action afforded by 42 U.S.C. § 1983.

9.      This Court also has jurisdiction pursuant to the specific grant of 28 U.S.C. § 1343 because Plaintiff seeks to recover damages for the deprivation of his Constitutional rights. The exercise of this Court's jurisdiction is consistent with Article III, Section 2 of the U.S. Constitution. See U.S. CONST. Art. III, Sec. 2, cl. 1.

10.     This Court has jurisdiction to consider Plaintiff's state law claims properly joined under Fed. R. Civ. P. Rule 8 pursuant to 28 U.S.C. § 1367. The common law torts alleged were committed in furtherance of and conjunction with Defendants' violations of federal law, and the federal issues predominate over any state law issues that may be raised, which do not raise novel nor complex issues of state law.

11.     Venue is proper in the Middle District of Florida because a substantial part of the events and transactions giving rise to Plaintiff's claims occurred within the forum state and within the Middle District of Florida. See 28 U.S.C. §§ 1441, 1443.

## STATEMENT OF FACTS

12.     Since 2020, Plaintiff has engaged in a campaign of literature distribution in association with a group known as the "Goyim Defense League" (GDL). The GDL, which parodically stylizes its name and logo in the fashion of the Anti-Defamation League ("ADL"), engages in various Constitutionally protected flyer distribution and banner-display activities in the District and across the United States. Through their various First Amendment activities, Plaintiff and the GDL seek to bring public awareness to their sincerely held beliefs on topics spanning American history, politics, religion, and government.

13.      Plaintiff's speech is controversial. Plaintiff and the GDL have garnered media coverage of their activities in nearly all 50 States. This is because Plaintiff's speech often arouses the most personal and intimate sensibilities of his fellow citizens—especially those sympathetic to the American Jewish population; Some of whom have accused plaintiff of being "antisemitic." See, e.g., Anti-Defamation League. "Backgrounder: Goyim Defense League." (July 5, 2023) ("GDL espouses vitriolic antisemitism and white supremacist themes").

14.     Plaintiff engages in political and religious commentary by sharing flyers with members of his community. Each flyer Plaintiff has distributed contains a URL where the reader can navigate to a website to view the same or similar flyers. See <GTVflyers.com>.

15.     Since 2020, Plaintiff has engaged in the random distribution of flyers throughout the District. Plaintiff has done so lawfully and without malicious intent. Indeed, every flyer Plaintiff has ever distributed includes the printed words "these flyers were distributed randomly without malicious intent."

16.     While some of the flyers plaintiff distributes are more controversial than others, Plaintiff frequently distributes—and plans to continue to distribute—flyers containing no vulgar language or images. Although the content of the flyers is sometimes sensational, Plaintiff's speech does not contain any fighting words or calls to action, but purports to include statements of fact, often citing mainstream news headlines. The flyers provide information on topics ranging from the history of the trans-Atlantic slave-trade; to gun control; abortion; immigration; economics; feminism; the JFK assassination; the Israel-Palestine conflict; and the relationship between religion and American politics. As is relevant to this case, some of the flyers are openly critical of Jewish influence in American public life.

17.     Defendant State Representative Randy Fine harbors animus toward Plaintiff and his speech. But don't take Plaintiff's word for it, take Representative Fine's words: "We'll never defeat antisemitism with a******* like you in our state. You're scum." "The same pathetic loser, Colby Frank… jumped me two weeks ago." Representative Fine has also called Plaintiff an "antisemitic terrorist."

18.     Because he disagrees with the speech in Plaintiff's flyers, Representative Fine initiated a targeted campaign of retaliation with a stated intent of prohibiting Plaintiff from distributing them. It began with non-legislative activity. First, Representative Fine sought to intimidate Plaintiff into silence by harassing him online. Representative Fine accused Plaintiff of having committed a violent felony. Not True. Then, Representative Fine accused Plaintiff of burglarizing his office. Also false. He also referred to Plaintiff by name and image, holding a press conference with the Volusia County Sheriff's Office while intimating that he would pass legislation to put Plaintiff in jail for his speech. Then, Representative Fine took official, legislative action. He authored and co-introduced a law, H.B. 269, seeking to classify Plaintiff's flyers as "litter." His stated intention was to outlaw Plaintiff's literature distribution by classifying his flyers as "litter" under Florida's anti-littering statute. See FL Stat. 403.413, Florida Litter Law.[1] Even leaving the legislation aside, Representative

---

[1] It bears noting that Plaintiff was actually arrested and jailed in connection with a protected literature distribution campaign. Plaintiff was filming the arrest of a friend who purportedly violated Florida Litter law, as interpreted by one State jurisdiction, when the friend distributed the same literature as Plaintiff onto private residences. But Plaintiff is not basing his retaliation claim on that event alone. Rather, Plaintiff is asserting that Representative Fine's cumulative conduct –with or without his conduct as co-author and co-introducer of HB 269—is sufficient to state a claim. See *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005) ("A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights.")

Fine's retaliatory conduct taken outside the scope of his lawmaking role violated Plaintiff's rights. The pertinent facts supporting Plaintiff's claims are as follows:

**I.    Representative Fine engages in an overwhelming pattern of targeted retaliation against Plaintiff.**

    **A. Representative Fine engaged in retaliatory conduct outside the regular course of the legislative process.**

19.     Representative Fine undertook a campaign to threaten adverse consequences for individuals distributing Plaintiff's religious and political literature. As part of that campaign, Representative Fine made several knowingly false defamatory statements about Plaintiff, both online and in public. He took these retaliatory actions against Plaintiff outside the regular course of legitimate legislative process. Those acts are set forth as follows:

    **1. Representative Fine made threatening statements about Plaintiff's literature distribution on February 27, 2023 with the intention of deterring plaintiff from engaging in protected speech.**

20.     On February 27, 2023, Representative Fine delivered remarks alongside the Volusia County Sheriff Michael J. Chitwood. There, Defendant Fine announced his intention to use legislation to arrest and imprison Plaintiff for his flyer distribution activities.

21.     At the press conference, Sheriff Chitwood discussed his office's desire to "crush a radical group of cowardly scumbags," referring specifically to "GDL members." Sheriff Chitwood described a literature distribution campaign

involving Plaintiff's flyers. In Sheriff Chitwood's words, "this is not about free speech. This is about violence." With Representative Fine standing by, Sherriff Chitwood continued, "Clearly I don't see anything that these people can say this is First Amendment. This is nothing but pure, pure, pure, evil."

22.      During the press conference, Sheriff Chitwood introduced the name and photograph of individuals who distributed Plaintiff's literature the weekend before, including Plaintiff.





23.      Referring to the February 27, 2023 press conference, Representative Fine stated "I was honored to join Volusia County Sheriff Chitwood yesterday for an extraordinary press conference calling these people what they are –

scumbags – and committing to pass HB 269 which will put them where they belong – in prison."

24.     During his remarks at the press conference, Representative Fine stated, "Now we're doing something about this in Florida. We have a Bill, H.B. 269, that will make clear that while you have the right to be an idiot, and you have the right to be a Nazi, and you have the right to walk down the street whenever you want and say whatever you want, that when your speech turns into conduct, that is where we draw the line. There is no First Amendment right to litter… in Florida, if you do that, you're going to go to jail. And you're going to go to jail for a very long time."

25.     Representative Fine stated, "I'm proud that all of my colleagues up here are co-sponsoring this Bill, because we're going to do something about it."

26.     Representative Fine stated, "The fight is coming. With people like my colleagues, with people like Sherriff Chitwood, we're going to let these people know: You're not welcome here in Florida."

27.     Representative Fine stated, "There is no First Amendment right to conduct. There is a First Amendment right to speech. And the things that we're targeting in the Bill are not speech."

28.     Representative Fine stated, "If you want to litter, it's a crime right now. But if you litter and your motivation is a hate crime, it is a third-degree felony and you will spend five years in jail."

29.     Representative Fine stated, "We are going to end this in Florida. We're going to stop it."

30.     Representative Fine stated, "What has changed today, as you can see here, is they don't wear masks. They put it on the internet. They are proud of these beliefs."

31.     Representative Fine stated, "One of the ideas we came up with with the Sherriff today, he asked us, I think the Bill right now will go into effect on October first, he suggested why don't you make it upon signature, and I think we'll be looking at amending the Bill so as soon as we can get it passed, and as soon as the Governor were to sign it, then it would become law immediately."

32.     Representative Fine stated, "I will tell you what I am most looking forward to. I can't wait to see if those cowards want to show up and stand in front of me in Tallahassee. That's what I'm looking forward to."

33.     Referring to the individuals Sheriff Chitwood listed by name and photograph, including Plaintiff, Representative Fine stated, "They don't scare me, I'm not afraid of them and we're coming for them."

34.     Taken together, Representative Fine's statements threatened that adverse action—namely prosecution and jailing—would imminently follow for Plaintiff and for those who engage in distributing Plaintiff's protected literature. At the time Representative Fine delivered the remarks on February 27, 2023 and today, Plaintiff feared that adverse action would imminently follow were he to

continue to engage in the distribution of his protected literature. Representative Fine's conduct and remarks at the February 27, 2023 event would deter a person of ordinary firmness from the exercise of First Amendment rights in the form of literature distribution. They fall outside the regular course of legitimate legislative process.

> **2. Representative Fine threatened jail time in response to an unrelated flyer on April 22, 2023, with the intention of deterring plaintiff from engaging in protected speech.**

35.     On April 22, 2023, Representative Fine received a political flyer on his driveway. Plaintiff was not the creator or distributor. In a Facebook post, Representative Fine referred to the person who allegedly delivered the flyer, stating "he won't be able to do this much longer. Once HB 269 is signed by Governor DeSantis, he will get five years in prison to consider the downside of trespassing and littering hate speech." The post evinces Representative Fine's pattern of animus toward political flyers—including a penchant for publishing personal information with the intent that third parties harass the distributor.



### 3. Representative Fine manufactured a false account of an interaction with Plaintiff on October 4, 2023 with the intention of deterring plaintiff from engaging in protected speech.

36.     On October 4, 2023, Plaintiff sought to speak with Representative Fine outside the Brevard Federated Republican Women's monthly meeting, where Representative Fine was scheduled to appear as the keynote speaker. Because he was concerned about being arrested, prosecuted, or jailed for continuing to distribute his religious and political literature, Plaintiff intended to ask Representative Fine about his role in drafting Florida House Bill 269, and why Representative Fine threatened to criminalize his First Amendment activities by classifying his religious and political flyers as litter.

37.     On October 4, 2023, Plaintiff approached defendant Fine with a GoPro camera in one hand, and a stapled packet of his political and religious literature in the other hand.

38.     As Representative Fine approached the venue, Plaintiff asked "Is that Randy Fine? Mr. Fine?"

39.     Representative Fine acknowledged Plaintiff, and Plaintiff identified himself: "Colby Frank, Goyim Defense League."

40.     Plaintiff then invited Representative Fine to debate with him regarding the literature he was carrying, and to discuss a range of topics relating to politics and religion.

41.     Representative Fine scoffed at Plaintiff, and responded by calling Plaintiff "scum," "a f****** Nazi" and other terms.

42.     Representative Fine exclaimed, "you're lucky I don't punch you in the f****** face."

43.     Representative Fine said that "antisemitism" could never be defeated with "a******* like you in our state."

44.     Representative Fine responded to Plaintiff's final debate invitation by stating "you're scum" and "you're beneath me." He then stormed off.

45.     That same day, October 4, 2023, Representative Fine falsely claimed before an audience of Republican women that *Plaintiff* had assaulted *him* prior to the speaking engagement. Representative Fine also falsely stated to the press that Plaintiff "jumped" him in the parking lot before the event.

46.     Plaintiff's hands were occupied throughout the entire October 4 encounter. At no point did Plaintiff show signs of aggression.

47.     Referring to the interaction, Representative Fine falsely stated on Twitter, "I just got jumped by a Nazi with a camera walking into a widely publicized speaking event just now. I'm fine; not sure today will go down as one of his better days."



48.     Representative Fine falsely stated to Florida Today, which published an article with his statement, that Plaintiff had "unleash[ed] a stream of invective about Jews and wanted to know why I wouldn't debate him, or whatever." In truth and in fact, Plaintiff did not use those words at any time during the interaction, which was video recorded. To the contrary, Plaintiff represented that he was willing to "cease and desist" from sharing any more flyers if Representative Fine would agree to have a gentlemanly debate with him regarding the content of the flyers. Representative Fine later repeated the knowingly false statement that he had been "jumped" by Plaintiff both on Twitter and to Florida Today.

*[image appears on next page]*


Florida Today   Follow

# Brevard Rep. Randy Fine says run-in with anti-Jewish extremist left him 'a little shaken'

Story by Eric Rogers, Florida Today • 4d

State Rep. Randy Fine said he had an "unsettling" encounter Tuesday with a member of an anti-Jewish extremist group outside a speaking engagement in Cocoa, warning it appeared to be an escalation of recent antisemitic incidents in the area.

Fine, who is Jewish, said the man aggressively approached him with a camera outside an unrelated meeting of the Brevard Federated Republican Women on Tuesday at the Space Coast Convention Center in Cocoa, where Fine was booked to speak.

"He runs up to me and he goes, I'm so-and-so — I don't remember his name — with the Goyim Defense League," Fine told FLORIDA TODAY. "He then proceeds to unleash a stream of invective about Jews and wanted to know why I wouldn't debate him, or whatever."

49. Taken together, Representative Fine's statements during and after the October 4, 2023 interaction threatened that adverse action would imminently follow if Plaintiff continued to exercise his speech rights. Specifically, Representative Fine's threat of assault by punching Plaintiff in the face would deter a person of ordinary firmness from exercising their First Amendment rights. At the time of Representative Fine's statements on October 4, 2023 and

today, Plaintiff feared that adverse action would imminently follow for engaging in the distribution of his protected literature. And indeed, adverse action did follow, in the form of defamatory remarks about Plaintiff and a threatened assault against Plaintiff.

### 4. Representative Fine made *per se* defamatory statements about Plaintiff on October 4, 2023 with the intention of deterring plaintiff from engaging in protected speech.

50.     Following Plaintiff's interaction with Representative Fine on October 4, Representative Fine made additional *per se* defamatory and knowingly false statements about Plaintiff.

51.     Representative Fine followed up on his previous false statement accusing Plaintiff of "jump[ing]" him. As if to quell concern, he stated on Twitter, "I got pictures." Representative Fine then shared a photograph of Plaintiff captioned, "Here's a pic of the Nazi who jumped me." The image was viewed over 28,000 times on Twitter alone. Representative Fine further boasted, "clearly, he couldn't take it one on one." For what it's worth, Plaintiff has no interest in a physical altercation with Representative Fine, or "tak[ing] it one on one."

*[image appears on next page]*



52.     Representative Fine falsely stated on Twitter that Plaintiff was being prosecuted for a violent felony. This knowingly false and *per se* defamatory statement was viewed over 4,900 times.



53.     Mr. Fine's statement is at best made with reckless disregard for the truth or falsity of the statement, because the charging language associated with a dismissed count against Plaintiff indicated obstructing arrest "*without violence.*"

54.     Representative Fine's knowingly false and defamatory statements made on October 4, 2023, would deter a person of ordinary firmness from exercising their free speech rights, for fear of being defamed and harassed online.

**5.    Representative Fine made false defamatory statements about Plaintiff on December 1, 2023 with the intention of deterring plaintiff from engaging in protected speech and accessing the courts.**

55.     On December 1, 2023, Representative Fine falsely accused Plaintiff of burglarizing his office, referring to Plaintiff by name, as well as calling Plaintiff an "antisemitic terrorist."



**State Representative Randy Fine** ✔
December 1, 2023 · 🌐

Today, these three Nazis drove to Brevard County and attempted to break into my office.   Bad move.  One of them was the same pathetic loser, Colby Frank, who jumped me two months ago.  Having failed 1-on-1 back then, he tried again 3-on-1 today.  Same outcome.   Here they are fleeing the scene with their tails between their legs.  I want to thank Palm Bay Police Department and the Florida Department of Law Enforcement for their response afterwards and helping me ensure we don't back down from antisemitic terrorists.   If you recognize the other two, please let me know.

56.     In truth and in fact, on December 1, 2023, Plaintiff was attempting to provide Representative Fine with notice of this lawsuit. Plaintiff did not

knowingly engage in any unlawful behavior, nor did he have the intent to engage in any unlawful behavior. Representative Fine's intimation that Plaintiff attempted to "break in" to Representative Fine's office is an allegation of criminal activity that constitutes defamation *per se*.

57.     Representative Fine's allegation that Plaintiff is a "terrorist" is likewise false on its face, and an actionable defamatory statement.

### 6. Representative Fine made threatening statements about Plaintiff's speech on December 19, 2021 with the intention of deterring plaintiff from engaging in protected speech.

58.     Plaintiff also participates in displaying banners in public places expressing his political and religious beliefs. On December 19, 2021, Plaintiff participated in displaying a political slogan on an Interstate-95 overpass. Representative Fine, communicating his personal dislike for Plaintiff's speech, called for violence in response to the display. Representative Fine stated "Kyle should shoot these assholes" with accompanying reshared language "This is sickening!!" The statement was an apparent reference to the culturally divisive Kyle Rittenhouse incident, which was circulating in the press around that time.

59.     Representative Fine's remarks toward Plaintiff on December 19, 2021 would deter a person of ordinary firmness from the exercise of First Amendment rights in the form of literature distribution and displaying banners with political slogans near public roadways.

**7. Representative Fine participated in directing the non-profit Anti-Defamation League and law enforcement agencies to monitor and arrest Plaintiff and other First Amendment activists for engaging in protected literature distributions.**

60.     In June 2023, the City of Oakland, Florida decided not to charge a man accused of distributing a flyer with the words "white lives matter." Oakland Police Chief Darron Esan stated that "while the messages being sent were offensive to many, there were no attempts at intimidation or threats being made. Making an arrest in this situation would not have fit within the guidelines of state statute." Representative Fine requested an explanation from Chief Esan and the State Attorney as to why no charges were filed. On information and belief, Representative Fine stated to Chief Esan "We passed the law. We expect you to use it." Stacie L. Quinn, FCRM, the Director of Police Administration for the City of Oakland, confirmed that Representative Fine called Chief Darron Esan, and that the two exchanged email communications shortly following the incident.

61.     Sheriff Chitwood also commented on the Oakland incident, stating, "I would employ their leadership to research house bill, 269 because they should've been charged."[2] Apparently, based on Representative Fine's remarks at the February 27, 2023 press conference (or some other conversation) Sheriff

---

[2] See Puglisi, David. "Florida police department under scrutiny, accused of not enforcing a new law on antisemitism." FOX 35. June 13, 2023 *available at* < https://www.fox35orlando.com/news/oakland-pd-under-scrutiny-from-officials-who-believe-they-are-not-enforcing-a-new-on-antisemitism>

Michael J. Chitwood of the Volusia County Sheriff's office had developed a belief that political flyers—like Plaintiff's literature—could be classified as "litter" and that individuals similar to Plaintiff could be lawfully arrested under Florida Littering law for engaging in literature distribution activities.

62.     Anti-Defamation League Florida Senior Associate Regional Director Yael Hershfield provided remarks at the same February 27, 2023 Volusia County Sheriff's Office press conference where Representative Fine announced his plan to pass H.B. 269 and use H.B. 269 to unlawfully arrest and imprison Plaintiff and other activists for engaging in Constitutionally-protected speech activities.

63.     On information and belief, Representative Fine directed Ms. Hershfield and Sheriff Chitwood on February 27, 2023 to monitor Plaintiff's protected literature distributions, and to arrest individuals engaged in the distribution of Plaintiff's protected First Amendment literature—just like he did with Oakland Police Chief Esan.

64.     On or about January 23, 2024, the Anti-Defamation League produced a document identifying Plaintiff by name and photograph, while describing a literature distribution activity that Plaintiff was planning for the weekend of February 17—18, 2024.

65.     On information and belief, the Anti-Defamation League shared this document with law enforcement personnel including the Volusia County Sherriff's Office and the Palm Beach County Sheriff's Office (the document states

"FOR INTERNAL LAW ENFORCEMENT USE ONLY"). The document further states "Do not distribute without permission from the Anti-Defamation League."

66.     The document falsely communicated to law enforcement personnel, including the Volusia County Sheriff's Office, that Plaintiff was planning an "extremist event" at the 2024 Daytona 500:



67.     In truth and in fact, Plaintiff initiated a fundraising campaign on the fundraising website GiveSendGo that includes the following description for the February 17—18 event:

> In today's increasingly hostile world against Whites&Christians it is important to educate our own on the current situation. This campaign is to assist with funding of white Civil Rights activities. Most activities will include educational hand to hand distributions of religious and political literature with intent to enlighten our otherwise lost folk and bring an end to the darkness that has a grip over this nation. Other activities include inviting political and other influential figures to debate, public speaking, and campaigning. All proceeds from this campaign will go directly to the activists on the ground equally after each event. Printer ink, paper, fuel, time off work, etc are all costs incurred by these brave and heroic men. Support your first amendment rights!

See <https://www.givesendgo.com/Whitecivilrights>

68.     Viewing a document addressed to law enforcement that accuses one of planning an extremist event, when the event is actually a peaceful literature distribution, would deter a person of ordinary firmness from the exercise of First Amendment rights by following through with that literature distribution. This is especially so when the organization's senior official appeared alongside State Representative Fine, and communicated her support for his campaign to arrest and jail demonstrators who may distribute the protected literature in question.

**B. Representative Fine engaged in retaliatory conduct within the scope of his role as a State Legislator.**

69.     Representative Fine co-authored and co-introduced Florida House Bill 269 (2023). See FL Stat 403.413(6)(a)(1)-(2). Exhibit A.

70.     In relevant part, the bill adds a hate-crime enhancement to Florida littering law. In short, the Bill enhances punishment for persons "dumping litter" on private property for non-commercial purposes when the "litter" contains "intimidating or threatening" content. Under the new law, if the offender deposits "litter" onto private property "for the purpose of intimidating or threatening the owner, resident, or invitee" of the property, then they are guilty of a misdemeanor. Without the "intimidating or threatening" content however, the person would otherwise be guilty of only a noncriminal infraction and civil penalty.

71.     On April 27, 2023 the Jewish Telegraphic Agency reported that "The law was written specifically to address the kinds of activities the Goyim Defense League regularly engages in."[3]

72.     Acting as House Whip in the Florida Legislature, Representative Fine campaigned for H.B. 269, and was present alongside Governor Ron DeSantis when H.B. 269 was signed into law on foreign soil. Representative Fine attended a press conference on February 27, 2023 to support the Bill, with the stated intention to arrest and imprison his detractors, where Plaintiff was specifically mentioned by name—and with his picture shown as if he is a

---

[3] See Lapin, Andrew. "A Florida sheriff is on the warpath against neo-Nazi 'scumbags' who want him dead." Jewish Telegraphic Agency. April 27, 2023 available at <https://www.jta.org/2023/04/27/united-states/a-florida-sheriff-is-on-the-warpath-against-neo-nazi-scumbags-who-want-him-dead>

criminal when he is not and has never been. Representative Fine himself stated, on live television, alongside state police officers that Plaintiff (and others engaging in protected literature distribution) belong in prison for actions that were not criminal until Representative Fine himself campaigned to make those actions criminal. He did so because he disagreed with the content in Plaintiff's political and religious literature. Given this context, Representative Fine's conduct in drafting, co-introducing, and lobbying for the passage of H.B. 269 in his official capacity as State Representative and House Whip would deter a person of ordinary firmness from exercising their First Amendment right to distribute literature, for fear of the adverse consequences of arrest, prosecution, and jailing. The fear is reasonable because those consequences actually occurred.

## CLAIMS FOR RELIEF

**COUNT 1: First Amendment Retaliation, 42 U.S.C. § 1983.**

73.     Defendant Representative Randy Fine engaged in a pattern of retaliatory conduct against Plaintiff with the stated intent and effect of depriving Plaintiff of his rights to speak and publish literature in violation of the First Amendment of the United States Constitution.

74.     Defendant Fine's retaliatory conduct adversely affected Plaintiff's protected speech by depriving him of the right to distribute and publish his literature at private residences and public events, under threat and intimidation of jail, imprisonment, defamation, and the invasion of his privacy. Defendant

Fine's retaliatory actions were the cause of the adverse effect on Plaintiff's rights. See *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).

75.     The result and effect of Representative Fine's conduct was the actual deprivation of Plaintiff's right to speak and publish his protected literature, specifically to distribute his flyers containing political and religious literature at private residences and at public events within the District.

76.     To alleviate any concerns the Court has previously expressed relating to applicable Eleventh Circuit precedent respecting shotgun pleadings, Plaintiff sets forth below all paragraphs that specifically support his claims for First Amendment retaliation pursuant to Section 1983. In listing these numbered paragraphs, Plaintiff notes the Eleventh Circuit's guidance that a Plaintiff asserting a claim for First Amendment retaliation must allege facts giving rise to a plausible inference that Defendant was subjectively motivated to engage in the adverse action because of Plaintiff's protected speech. See *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008). Because Defendant Fine engaged in a wide-ranging campaign of retaliation and harassment against Plaintiff in response to his protected speech, the numbered paragraphs supporting Plaintiff's Count 1 are numerous.

77.     Representative Fine engaged in First Amendment retaliation by acting under color of state law, through acts that occurred outside the regular course of the legislative process. ¶¶ 19–60, 63.

78.     Representative Fine engaged in First Amendment retaliation by acting under color of state law, within the regular course of his official role as a Florida State Legislator by co-authoring and co-introducing Florida House Bill 269 (2023). ¶¶ 19—35; 60; 69—72.

79.     Plaintiff prays for $4,500,000 in damages to remedy Defendant's First Amendment retaliation and the resulting deprivation of Plaintiff's Constitutional rights.

**COUNT 2: Defamation**

80.     Defendant Fine made statements about Plaintiff that were knowingly false, reckless, or some combination thereof.

81.     Defendant Fine issued a public statement claiming with actual malice that Plaintiff has been prosecuted for a "violent felony," where the public record demonstrates that Plaintiff has been arrested for obstructing arrest "without violence" and for a nonviolent misdemeanor. Defendant Fine's statement falsely accusing Plaintiff of criminal misconduct constitutes defamation *per se.* ¶¶ 52—53.

82.     Defendant Fine issued a public statement claiming with actual malice that Plaintiff attempted to burglarize his office, while describing Plaintiff as a "terrorist." Defendant Fine's statements accusing Plaintiff of criminal misconduct constitute defamation *per se.* ¶¶ 55—57.

83.     Defendant Fine issued a public statement claiming with actual malice that Plaintiff assaulted him on October 4, 2023. Defendant Fine's statement accusing Plaintiff of criminal misconduct constitutes defamation *per se.* ¶¶ 45−48, 51.

84.     Defendant Fine also failed to make any inquiry or proper investigation prior to publishing the *per se* defamatory statements of false fact which constitutes actual malice and reckless abandon. See *Herbert v. Lando*, 441 US 153 (1979).

85.     There also exists between Plaintiff and Defendant "rivalry, ill will, or hostility between the parties, facts tending to show a reckless disregard of the plaintiff's rights." *Id.*

86.     Plaintiff prays for $4,000,000 in compensatory damages to remedy Defendant Fine's unlawful defamation.

**COUNT 3: Invasion of Privacy**

87.     Defendant Fine wrongfully and unlawfully appropriated Plaintiff's image and likeness, shared and published photos of Plaintiff in connection with false defamatory statements that Plaintiff had committed a violent crime, and promoted the dissemination of that image alongside defamatory information to various media outlets in the District and State. ¶¶ 18, 22−33, 48, 51−52. He did so for personal gain, including to promote support for his political campaign. Ibid.

88.     Plaintiff prays for $1,000,000 in compensatory damages to remedy Defendant Fine's unlawful appropriation of Plaintiff's name and likeness, which constitute an invasion of Plaintiff's privacy at common law.

WHEREFORE Plaintiff Colby Alexander Frank respectfully requests the following relief:

i)      Entry of judgment for damages against Defendant in the aggregate amount of $9,500,000, plus punitive damages;

ii)     Costs, interest, and reasonable attorneys fees;

iii)    Any such other relief as the Court deems just and proper.

Respectfully submitted this July 18, 2024.

/s/ Colby Alexander Frank

*Pro Se*
PO Box 13264
Fort Pierce, FL 34979
941-275-5712