IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| COLBY ALEXANDER FRANK,<br><br>       Plaintiff,<br>v.<br><br>RANDALL ADAM FINE (a/k/a RANDY FINE) in his official capacity as Member of the Florida House of Representatives for the 33rd Congressional District of the State of Florida; and in his individual capacity,<br><br>       Defendant. | Case No.: 6:23-cv-2043-JSS-RMN<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S THIRD AMENDED COMPLAINT** |

My name is Colby Frank. I'm acutely aware of the culturally and politically sensitive context of my lawsuit against Randy Fine. At the end of the day, the court is likely viewing this case as boiling down to a single question: do Nazis have free speech? It's like the law school hypothetical that all the students in class are afraid to answer for fear of sparking controversy.

If this were a novel question, it would be a difficult one. But it's nothing new. The U.S. Supreme Court has already decided that the First Amendment applies with full force (perhaps with even greater force) to disagreeable speech. Even offensive speech, or so-called "hate speech" is protected speech under the First Amendment. See *Matal v. Tam*, 582 U.S. 218 (2017); *Snyder v. Phelps*, 562 U.S.

443 (2011); *National Socialist Party of America v. Village of Skokie*, 432 U.S. 43 (1977); *Beauharnais v. Illinois*, 343 U.S. 250 (1952); *Terminiello v. City of Chicago*, 337 U.S. 1 (1949). Still, this case is different from the Nazis marching in *Skokie*, or the Westboro Baptist Church members bombastically picketing a funeral in *Snyder*. Plaintiff isn't marching, gathering, or inciting calls to violence against anyone. He's circulating pamphlets.

Since Thomas Paine, the practice of circulating pamphlets like his famous *Common Sense* has been the most straightforward method of publishing and circulating ideas in our free society. Our founders recognized this, and in 1789 they enshrined the freedom of the press in our First Amendment. That right has been incorporated against the States for nearly a century since the Supreme Court's decision in *Near v. Minnesota*, 283 U.S. 697 (1931).

State Representative Fine doesn't like these American ideals. Instead, he prefers the practice of tyrants: censorship. "Censorship reflects a society's lack of confidence in itself. It is a hallmark of an authoritarian regime." *Ginzberg v. United States*, 383 U.S. 463 (1966) (Potter, J., dissenting). Dating to President Adams' Alien and Sedition Acts, we've rejected the practice of censorship in America for centuries.

The American tradition is one that respects the marketplace of ideas. "The aim of the historic struggle for a free press was to 'establish and preserve the right of the English people to full information in respect of the doings or

2

misdoings of their government.'" *United States v. Rumely*, 345 U.S. 41, 56 (1953), quoting *Grosjean v. American Press Co.*, 297 U. S. 233, 247 (1936). The Court should uphold that tradition here, and allow Plaintiff to present his case.

There is no "legislative privilege" to threaten retaliatory legislation and jail for political detractors engaging in disagreeable speech. There is no "legislative privilege" to call for the arrest and jailing of your political opponents. And there is certainly no "legislative privilege" to defame and harass someone for circulating ideas you don't like. In any event, these are all Representative Fine's defenses to raise and argue himself – it is not this Court's prerogative to erect them *sua sponte* as shields for his unlawful conduct.

I. **Representative Fine's conduct meets the elements of a first amendment retaliation claim.**

The First Amendment protects "not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Echols v. Lawton*, 913 F.3d 1313, 1320 (11th Cir. 2019), quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). It is "settled law that state officials may not retaliate against associations and individuals for their exercise of First Amendment rights." *Georgia Ass'n of Educators v. Gwinnett Cnty. Sch. Dist.*, 856 F.2d 142, 145 (11th Cir. 1988). Here, Representative Fine did both. He did so through legislative means, and also through means wholly independent of the legislative process. He used his status as a legislator to personally call law

3

enforcement agencies and ask them to act as his personal enforcers. His message was clear: He asked police departments to shut down speech he didn't like by arresting his political opponents. See TAC ¶¶ 60–63.

The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." *Bart v. Telford*, 677 F.2d 622, 625 (Posner, J.). Representative Fine's pattern of targeted retaliatory conduct far surpasses the bar to state a First Amendment claim for retaliation.

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that some person, acting under color of state law, deprived Plaintiff of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983; *Bannum, Inc. v. City of Ft. Lauderdale*, 901 F.2d 989, 996–97 (11th Cir. 1990). To state a retaliation claim, a private citizen must establish: (1) that his or her "speech or act was constitutionally protected"; (2) "that the defendant's retaliatory conduct adversely affected the protected speech"; and (3) "that there is a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).

### 1. The TAC establishes that Plaintiff engaged in constitutionally protected speech in the form of literature distribution

The first element is satisfied because the TAC sufficiently alleges that plaintiff engaged in constitutionally protected speech. See TAC ¶ 12 ("Since 2020,

4

Plaintiff has engaged in a campaign of literature distribution…); ¶ 14 ("Plaintiff engages in political and religious commentary by sharing flyers with members of his community); ¶ 15 ("Since 2020, Plaintiff has engaged in the random distribution of flyers throughout the District"); ¶ 16 ("Plaintiff frequently distributes—and plans to continue to distribute—flyers… The flyers provide information on topics ranging from the history of the trans-Atlantic slave-trade; to gun control; abortion; immigration; economics; feminism; the JFK assassination; the Israel-Palestine conflict; and the relationship between religion and American politics"); ¶ 67 ("Most activities will include educational hand to hand distributions of religious and political literature…").

Plaintiff's random distribution of flyers in his community, whether a private residences, public events, or online, is protected First Amendment activity. See *Schneider v. State*, 308 U.S. 147 (1939) (holding that an anti-littering law may not infringe the First Amendment rights of people trying to circulate information or opinions); *Jamison v. Texas*, 318 U.S. 413 (1943) (ordinance forbidding the distribution of leaflets denied appellant freedom of press and of religion guaranteed to her by the First and Fourteenth Amendments of the Federal Constitution); *Martin v. Struthers*, 319 U.S. 141 (1943) (nuisance law prohibiting door to door distributers of literature "is invalid because [it is] in conflict with the freedom of speech and press."); *Talley v. California*, 362 U.S. 60 (1960) (ordinance forbidding anonymous distribution of handbills violates the

5

First Amendment); *Watchtower Bible & Tract Society of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150 ("ordinance's provisions making it a misdemeanor to engage in door-to-door advocacy without first registering with the mayor and receiving a permit violate the First Amendment as it applies to religious proselytizing, anonymous political speech, and the distribution of handbills.").

    **2.    The TAC establishes that Defendant Fine's retaliatory conduct adversely effected Plaintiff's protected speech.**

For conduct to "adversely affect" protected speech, Plaintiff must make two showings to satisfy the Eleventh Circuit's test. First, Defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of constitutional rights. *Echols*, 913 F.3d at 1320. Second, the Eleventh Circuit has also guided that Plaintiff must allege facts giving rise to a plausible inference that Defendant was subjectively motivated to engage in the adverse action because of Plaintiff's protected speech. See *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008). Both prongs of this element are satisfied because the TAC sufficiently alleges that Defendant Fine was i) subjectively motivated to engage in adverse action because of the specific content of Plaintiff's speech, and ii) that Defendant's conduct, which included threatened jailing and punching Plaintiff in the face for his speech, would likely deter a person of ordinary firmness from the exercise of their free speech rights. These were imminent threats. *Echols* at 1320.

6

*First*, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights. *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005). Any ordinary person would be deterred from the exercise of their First Amendment rights to engage in a literature distribution campaign if a State Representative took to the press and expressed his desire to pass laws that would jail the distributor. Moreover, any reasonable person would be deterred from sharing literature under the same circumstances when that same State Representative made those remarks alongside state law enforcement officials. "The threat of arrest is the quintessential retaliatory conduct that would deter a person of ordinary firmness from exercising First Amendment rights." *Turner v. Williams*, 65 F.4th 564, 580 (11th Cir. 2023). Therefore, Representative Fine's conduct—even without actually introducing and voting for legislation—would likely have deterred persons of ordinary firmness from exercising their First Amendment rights to speak and distribute literature under threat of arrest or jail.

*Second*, Defendant Fine was subjectively motivated to engage in adverse action because of Plaintiff's speech. E.g. TAC ¶ 26 ("with people like Sherriff Chitwood, we're going to let these people know: You're not welcome here in Florida"); ¶ 30 ("They are proud of these beliefs" [referring to Plaintiff]); ¶ 32 ("I can't wait to see if those cowards want to show up and stand in front of me in Tallahassee"); ¶ 33 ("Referring to the individuals Sheriff Chitwood listed by

7

name and photograph, including Plaintiff, Representative Fine stated, 'They don't scare me, I'm not afraid of them and we're coming for them'"); ¶ 44 ([to Plaintiff's face] "you're scum" and "you're beneath me"); ¶ 42 ("you're lucky I don't punch you in the f****** face"); See also generally ¶¶ 19—34; 55.

### 3. The TAC establishes a causal connection between Defendant Fine's retaliatory conduct and the adverse effect on Plaintiff's speech.

The third element is satisfied because the TAC sufficiently alleges that Defendant Fine's retaliatory actions adversely affected Plaintiff's speech, including Defendant's co-authoring and co-introducing a bill targeting Plaintiff's flyering activities, legislating to make Plaintiff's flyering activities unlawful, and making threats and *per se* defamatory publications about Plaintiff specifically by name and while using Plaintiff's image.

As a result of Defendant Fine's conduct, Plaintiff has been arrested, jailed, and deterred from exercising his right to speak and distribute literature for fear of arrest and imprisonment. Plaintiff's plans to engage in the peaceful distribution of religious and political literature were chilled because of Plaintiff's well-founded and substantiated fear of wrongful arrest and imprisonment. Indeed, this fear was reasonable because Plaintiff was actually arrested and jailed in connection with a protected literature distribution.

## II. Legislative Privilege does not bar Plaintiff's lawsuit at the Rule 12(b) stage

For the reasons set forth below, the Court improperly invokes "legislative privilege" as a bar to Plaintiff's lawsuit at the Rule 12 stage.

### A. Legislative privilege protects against *inquiries* into legislative motive only; it cannot be used as a blanket prohibition on civil actions

As this Court has noted, legislative privilege protects against searching inquiries into the subjective motivations of legislators. *In re Hubbard*, 803 F.3d 1298, 1310 (11th Cir. 2015). But this case is not an attempt to embark on a probing inquiry into a legislator's alleged retaliatory motive. Compare *In re Hubbard*, 803 F.3d 1298, 1310 (11th Cir. 2015). Nor is such an inquiry required here. Representative Fine has clearly and unequivocally stated his motive—to put Plaintiff in jail for engaging in flyer distribution activities. Indeed, the Defendant has gone to great lengths to make it widely known that he harbors a retaliatory animus toward Plaintiff. More specifically, he stated his intent to use H.B. 269 as a weapon to quell Plaintiff's distribution of literature and put Plaintiff in jail for his speech. See, e.g., TAC ¶¶ 20–34.

Judicial inquiry into Representative Fine's motives is not required here because Defendant Fine publicly made his retaliatory motivations clear. *In re Hubbard* is improperly applied to *Frank v. Fine* because the above case deals with

9

subpoenas and discovery requests where a legislative motivation was not *prima facie* readily available. Here, it is.

The legislative privilege articulated in *Hubbard* does not apply here. *In re Hubbard* involved a discovery request for the sole purpose of determining the legislator's subjective motivation in passing a piece of legislation. It makes sense to disallow such a request on grounds of legislative privilege. These kinds of searching inquiries indeed distract from a legislator's duties—and violate separation of powers by probing too deeply into the legislative process. This is the context in which *Hubbard* stated that the privilege "protects against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts."

That is a far cry from this case. *Hubbard*'s language doesn't apply here because Representative Fine's subjective motivation is already admitted. It does not require judicial determination. Not only is it already known, he has voluntarily publicized it to the whole world. Representative Fine's voluntary admissions clearly communicate his subjective retaliatory animus toward Plaintiff. E.g. TAC ¶¶ 19—34. This is nowhere in the ballpark of a legislator's honest attempts to dodge a discovery request on grounds that it was probing too deeply into his legislative deliberations. This is simply not a *Hubbard* scenario.

Applying any such language of *In re Hubbard* to bar Plaintiff's lawsuit effectively amounts to writing a blank check for legislators to engage in the exact

10

conduct alleged here: an overwhelming pattern of targeted retaliation against a political opponent, including calling for their arrest and jailing, as well as introducing and lobbying for laws to effectuate that stated purpose. This achieves the very antithesis of what *Hubbard* was aiming toward: protecting and preserving our system of separated powers; and preventing the abuse of our adversarial system—a concern that is much more poignant here given that the Defendant's threats and defamatory conduct are to largely blame for Plaintiff's inability to secure counsel who are willing to represent him.

It is important to note that this case is not an attempt to strike down an unconstitutional statute: the statute itself could not exist in the first place without a preexisting unconstitutional motivation. Compare Dkt 45 at 7. Plaintiff is challenging Representative Fine's conduct as a whole, including acts outside the ordinary course of legislation such as publishing *per se* defamatory claims.

### 2. Legislative Privilege is a defense that Representative Fine must affirmatively invoke.

The legislative privilege is a defense that must be affirmatively invoked by the defendant. See *In re Hubbard*, 803 F.3d 1298, 1311 (11th Cir. 2015) ("The lawmakers' motions to quash were sufficient *to invoke* their legislative privileges") (emphasis added). It would be improper for this Court to dismiss Plaintiff's lawsuit by finding *sua sponte* that legislative privilege protects Representative Fine's conduct. It is an argument to raise, not a standard to apply.

In any event, the legislative privilege properly applies, for instance, in the context of Rule 45 subpoenas seeking information about a legislator's motivation. "The privilege applies with full force against requests for information about the motives for legislative votes and legislative enactments." *In re Hubbard*, 803 F.3d 1298, 1310 (11th Cir. 2015). But this is a complaint, not a discovery request. And no inquiry into Representative Fine's motivations is necessary here to determine whether he was subjectively motivated to retaliate against Plaintiff's speech. He plainly stated that he was in fact subjectively motivated to retaliate against Plaintiff for Plaintiff's speech. E.g. TAC ¶¶ 19—34. That's not the issue.

### 3. Legislative Privilege does not apply to Representative Fine's conduct committed outside the regular course of legitimate legislative process

The passage of legislation is only one of many factors to be considered in determining whether Representative Fine's conduct would deter a person of ordinary firmness from engaging in speech activities. That is the standard the Court must consider when assessing whether Plaintiff has stated a claim for First Amendment Retaliation. Plaintiff's complaint asserts numerous acts that occurred outside the regular course of Defendant Fine's role as a lawmaker. TAC ¶¶ 19—60, 63. See B*rown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 416 (D.C.Cir.1995) (explaining that the privilege applies "when the action complained of falls within the legislative sphere"). To attempt to outlaw Defendant's political opposition through legislation has nothing to do with the

12

regular course of the legislative process. It is rather an irregular abuse of the legislative power. That is not protected conduct.

## III. Conclusion

For Plaintiff, this case could be stylized *David v. Goliath*. Representative Fine has vast financial resources and the ability to hire attorneys. Plaintiff does not have those resources, due in part to the fact that Representative Fine has defamed him, meaning lawyers do not want to risk their own personal reputation by representing him. Defendant is therefore being advantaged in this litigation *as a direct result of his own unlawful conduct*. That can't be right.

Then there are the endless procedural hurdles and frustrations. Yet again, one large reason Plaintiff has not been able to retain counsel to ensure zealous compliance with procedural rules is because Representative Fine sought to make associating with Plaintiff's name and ideology dangerous, and even criminal. But even trained counsel couldn't anticipate this Court's shifting rationales. In previous iterations of his pleadings (specifically the SAC), the Court has demonstrably failed to accurately portray his allegations, tending to use vague and ambiguous language when referencing the claims. At times, the Court has fundamentally misunderstood the claims. And with each and every recommendation for dismissal, the rationale as to why Plaintiff's pleading is insufficient has fundamentally shifted. First it was one form of shotgun pleading,

13

then another form of shotgun pleading.[1] Then, this Court found *sua sponte* that legislative privilege protected Representative Fine's conduct, improperly adding an element to the Eleventh Circuit's test articulated in *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005). But the fact that the Court now relies on legal propositions to reject his complaint is evidence that the court cannot conclude this case as stated in the complaint itself "has little or no chance of success." *Carroll v. Gross*, 984 F.2d 392, 393 (11th Cir. 1993). The Court should not therefore "dismiss the complaint before service of process." Ibid.

The oversimple notion that "Defendant supported legislation that Plaintiff doesn't like" minimizes the scale of the Defendant's conduct giving rise to this federal right of action. The reality is that Plaintiff has alleged a laundry list of specific retaliatory acts that Defendant took, including *but not limited to* threatening and following through with passing subjectively motivated legislation designed specifically to target Plaintiff's speech, while defaming and harassing him. These acts establish the adverse action element of a retaliation claim many times over. Given the sheer breadth of Representative Fine's

---

[1] In *Ranize v. Town of Lady Lake*, an amended complaint realleged and reincorporated all preceding paragraphs when stating a First Amendment retaliation claim under § 1983. No. 5:11-cv-00646-TJC-TBS (M.D. Fla. Oct. 12, 2012), Dkt. 13. In that case, the Middle District of Florida did not find plaintiff's complaint to be an impermissible shotgun pleading, and a judgment was later awarded in the plaintiffs' favor. Here however, Plaintiff's complaint was apparently inadequate.

14

rampant campaign of retaliation, Plaintiff doesn't need to challenge the facial validity of the statute to successfully state his retaliation claim—though the statute itself likely *is* unconstitutional. See *United States v. O'Brien*, 391 U.S. 367, 384, (1968) ("[t]he inevitable effect of a statute on its face may render it unconstitutional").

In another day, a court might issue a writ *quo warranto* against the Defendant and strip him of his capacity to fulfill any level of civil servitude in this nation. As a civil servant he is bound by law to deal with his opposition by democratic means. Threatening jailing, directing arrests, felonizing and outlawing his political opposition's ability to utilize the most basic and foundational civil right of the Constitution is effectively putting a gun to his opposition and saying "I'm in charge and you're not." He is leveraging his position as an official of the State, while calling on executive actors to dismantle his opponents, instead of winning fairly. Attempting to influence armed enforcers to quell his dissenters is an abuse of his official role as legislator. It runs roughshod over our Constitution. And it runs roughshod over Plaintiff's right under the First Amendment to be free from retaliation when distributing his pamphlets to his fellow citizens.

An existing ruling class should not be able to invoke their peculiar 'privileges' to outlaw any legitimate grassroots attempt to usher in a new ruling class that is more aptly suited to serve the people. That uproots the very

foundation of our democratic republic. I have a degree in Aerospace Engineering. Understanding what Representative Fine did here is not rocket science. He should have to answer for his brazen pattern of targeted retaliation against me. No one is above the law. And no one is above the Constitution. Neither is Randy Fine.

Respectfully submitted this 18th of July, 2024,

<u>/s/ Colby Alexander Frank</u>
*Pro Se*
PO Box 13264
Fort Pierce, FL 34979
941-275-5712